574 F.2d 727
 RCA GLOBAL COMMUNICATIONS, INC., Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
and
ITT World Communications Inc., TRT Telecommunications
Corporation, and Western Union International Inc.,
Intervenors.
 No. 993, Docket 76-4054.
 United States Court of Appeals,
Second Circuit.
 Submitted March 31, 1978.
Decided April 18, 1978.
 
 Cahill, Gordon & Reindel, New York City (H. Richard Schumacher, Robert T. Quinn, John A. Shutkin and Frances J. DeRosa, Charles M. Lehrhaupt of RCA Global Communications, Inc., New York City, of counsel), for petitioner.
 F.C.C., Washington, D. C. (Robert R. Bruce, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, Jack David Smith, Counsel, and John H. Shenefield, Asst. Atty. Gen., James F. Ponsoldt, Atty., Dept. of Justice, Washington, D. C., of counsel), for respondents.
 LeBoeuf, Lamb, Leiby & MacRae, New York City (Grant S. Lewis, John S. Kinzey, and Howard A. White, John A. Ligon, ITT World Communications, Inc., New York City, of counsel), for ITT World Communications Inc.
 Covington & Burling, Washington, D. C. (E. Edward Bruce, William P. Skinner, Washington, D. C., of counsel), for TRT Telecommunications Corp.
 ON REVIEW AFTER REMAND
 Before MOORE, FEINBERG and GURFEIN, Circuit Judges.
 MOORE, Circuit Judge:
 
 
 1
 Little purpose will be served by repeating the facts and legal conclusions contained in the several opinions of the Federal Communications Commission (FCC) and of this court issued during these protracted (some 13 years) proceedings. Reference is made to our opinion, 559 F.2d 881, reviewing the FCC orders of January 7, 1976, 57 F.C.C.2d 190, and September 27, 1976, 61 F.C.C.2d 183; our opinion, 563 F.2d 1, granting a rehearing and remanding the proceeding to the FCC for a limited review and the opinion and order of the FCC, January 8, 1978, F.C.C.2d, FCC 77-805, now before us for review.
 
 
 2
 In its original opinion, 559 F.2d 881, this court was disturbed by a direction of the FCC that all parties (international record carriers (IRCs)) "devote their efforts to forcing the public into an all-routed system". Id. at 890. Such a directive on its face, and in the absence of supporting facts, seemed at variance with, or even contrary to, the public interest and was opposed by the IRC parties. On remand, the FCC has expressly abandoned further consideration of prescribing an all-routed formula so that now we need only consider in accordance with our limited remand "whether the promulgation of the 'interim' formula has, in the opinion of the FCC, a factual basis in the record independent of the FCC's tentative preference for an all-routed system". 563 F.2d at 3.
 
 
 3
 Only the sketchiest reference to ancient history (1943) is required. Because the Western Union (WU)-Postal Telegraph merger in 1943 created a potentially monopolistic situation, the FCC, pursuant to Congressional directive, adopted for international telegram traffic, a so-called international formula in an attempt under conditions as they then existed to achieve a "just, reasonable and equitable formula" for the distribution of messages by WU to the various IRCs of the 1943 era.
 
 
 4
 Naturally, with the passage of time (1943-1976) conditions changed. These changes have been succinctly summarized by the FCC, 57 F.C.C.2d 190, 201:
 
 
 5
 "The IRCs expanded their gateway operations, and self-generated traffic (by definition specifically routed) became a more important part of total traffic than it was during the base year. The rapid increase in gate-way-originated traffic upset the delicate balance needed for the formula operation and caused a proportionate decline in the relative amount of unrouted traffic available to redress imbalances. . . . ."
 
 
 6
 These factual changes led the FCC and the intervenors herein to claim that the 1943 formula was no longer "just, reasonable and equitable" under 1976 conditions. After our remand, the interested parties (referred to as WU, WUI, ITT, TRT and RCA) submitted their comments to the FCC together with such factual material as was pertinent. Financial interests in such matters invariably being paramount, RCA and WUI stressed the loss of revenue (actual and potential) to them under the new formula; ITT and TRT pointed out that the long-endured inequities suffered by them would at last be rectified.
 
 
 7
 The focal point of RCA's attack on the new formula is the provision that the distribution of "unrouted" messages be made "among the carriers in direct proportion to their share of routed traffic" whereas under the old formula RCA was awarded the lion's share to the disadvantage of ITT, TRT and the smaller carriers.
 
 
 8
 Our function on review is limited. We are not to create and prescribe a formula of our own choosing. We lack the background information and experience to do so. We must look to the agency (the FCC) upon which Congress has devolved this responsibility. Courts have frequently taken a negative approach in expressing this thought, namely, that the agency's decision must be approved unless it is "arbitrary and capricious" or is not supported by substantial evidence. However, in our opinion, wherever possible a more affirmative approach is to be preferred where the facts, as here, warrant it.
 
 
 9
 We can only reiterate our statement upon the petition for rehearing:
 
 
 10
 "Although the purpose of the 1943 formula was to freeze the shares of industry participation because of the potentially unique situation created by the merger (of Western Union and Postal), that purpose cannot be stretched to giving RCA a right in perpetuity to a fixed share of the telegraphic market regardless of changing conditions and circumstances. It certainly could not have been the intention of the Congress or the FCC to permit RCA to sit back and do nothing to counteract tactics by its competitors and rely upon the 'formula' to give it the lion's share of the unrouted business." 563 F.2d at 2.
 
 
 11
 To this we add the FCC's reasons for the new formula's distribution of unrouted messages:
 
 
 12
 "By correlating the distribution of unrouted messages with routed messages, we insure that improvements in service or prices which earn the business of knowledgeable users will also be rewarded by unrouted messages. Thus, the incentive to provide the very best is maximized and the public interest will benefit accordingly. The service and price improvements made to attract knowledgeable users also enhance the quality of service to casual users since the facilities making up the service are blind to the identity of customers and to the manner in which the message came to be the responsibility of the carrier." (SJA 960) (Memorandum Opinion and Order of FCC dated January 6, 1978).
 
 
 13
 These seem to be sound and logical reasons for the new formula.
 
 
 14
 We have considered RCA's present objections. The main problem facing the FCC was what to do about unrouted messages. We would allay RCA's fears, bordering on in terrorem, that it will be forced to spend $2,000,000 on advertising to attract customers and will have to seek increased rates as a result. Given the relatively limited revenues at stake, no properly managed company would countenance the outside advertising expenditures projected by RCA. Nor was any evidence presented on remand that the IRCs were about to undertake any such runaway program.
 
 
 15
 As to the possible diversion of 50,000 unrouted messages from direct to indirect deliveries, this possibility is characterized by the FCC as "de minimis" and by RCA as "of relatively modest magnitude" (RCA Br. on remand, p. 40). To deprive the smaller carriers, which, at present at least, are dependent on this traffic, would not comport with the words "just" or "equitable". Furthermore, what is now "indirect" might well become "direct".
 
 
 16
 There is no reason why competition in the communications industry should be expected to have a different result than in the motor car, department store, electrical devices, radio and similar industries. All seek to attract business by offering a superior product for a reasonable price. Such practices are in the public interest in that the public should benefit therefrom.
 
 
 17
 The FCC has on at least five occasions received and weighed the views of RCA and the intervenors. We adopt without fear of plagiarism, the concluding comments of ITT, i. e.,
 
 
 18
 "The parties have all been heard, the issues have all been thoroughly ventilated, and the FCC, with this Court's guidance, has considered all factors relevant to its decision. There comes a point when administrative proceedings must come to an end, and a final decision must be made. That point has now been reached, and the FCC's Order on Remand should be affirmed by the Court." (ITT Br. at 53).
 
 
 19
 Accordingly, this Court affirms the Order on Remand of the FCC, adopted on November 30, 1977 and released on January 6, 1978.